# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| RANDA HARRIS | : | |
| Plaintiff, | : | |
| | | Case No. 3:09cv00092 |
| vs. | : | |
| | | District Judge Walter Herbert Rice |
| MICHAEL J. ASTRUE, | : | Magistrate Judge Sharon L. Ovington |
| Commissioner of the Social | | |
| Security Administration, | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATIONS[1]

## I. INTRODUCTION

Plaintiff Randa Harris suffers from back and neck pain, anxiety, and depression. In May 2003 she applied for Supplemental Security Income (SSI) with the Social Security Administration. Two months later, on July 18, 2003, after her husband passed away, Plaintiff filed an application for Widow's Insurance Benefits (WIB). Plaintiff asserted in her applications that she was eligible for SSI and WIB because she had been under a disability since December 31, 1990. (Tr. 80-83A, 569-71).

After initial denials of her applications, and two administrative hearings (Tr. 601-42; 643-63), Administrative Law Judge (ALJ) Thomas R. McNichols, II issued a decision partially favorable to Plaintiff, finding that she had been under a disability since April 3, 2006, but not before. (Tr. 23-39).

Plaintiff brings the present case challenging the Commissioner's conclusion that

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

she was not under a "disability" before April 3, 2006.  The Court has jurisdiction to review ALJ McNichols' decision.  *See* 42 U.S.C. §405(g).  The case is before the Court upon Plaintiff's Statement of Specific Errors (Doc. #9), the Commissioner's Memorandum in Opposition (Doc. #12), the administrative record, and the record as a whole.

Plaintiff seeks a reversal of the ALJ's decision and remand for payment of benefits. At minimum, Plaintiff seeks a remand of this case to the Social Security Administration to correct certain claimed errors.  The Commissioner seeks an Order affirming the ALJ's decision.

## II.     BACKGROUND

### A.     Plaintiff and Her Testimony

On her alleged disability onset date, Plaintiff was 39 years old and was thus considered a "younger person" for social security purposes.  *See* 20 C.F.R. §§404.1563; 416.963[2]; *see also* Tr. 37.  Between April 2001 and April 2006, she was classified as a "person closely approaching advanced age" for social security purposes.  At the time of the ALJ's decision (July 2006), Plaintiff was 55 years old, placing her in the category of a "person of advanced age" for social security purposes.

Plaintiff has a high school equivalent education and has no past relevant employment.  (Tr. 37, 109, 150).

During the ALJ's first hearing (December 2005), Plaintiff testified that she cannot work due to chronic pain in her low back and neck (Tr. 609), knee pain (Tr. 611), bronchitis (Tr. 613), carpal tunnel symptoms in both hands (Tr. 615), and depression. (Tr. 617).  She uses a heating pad and pain medication to alleviate her pain. (Tr. 610). She also has experienced weight gain as a side effect of medications.  (Tr. 619).

---

[2]  The remaining citations will identify the pertinent SSI Regulations with full knowledge of the corresponding WIB Regulations.

Plaintiff estimated that she could walk 1 city block before becoming short of breath and that she can stand for 15 minutes before she has back pain. (Tr. 624). She can sit for 10-15 minutes at a time. She is unable to use her arms, hands, and fingers during about 20% of the day. (Tr. 624-25). She estimated she could lift 5 pounds. (Tr. 625). Plaintiff also has shortness of breath when she climbs stairs. She explained that she cannot perform any of her past work because she cannot stand and pick things up and that she could not do sedentary work because she "can't think" and "can't focus." (Tr. 626).

As to her activities of daily living, Plaintiff has a valid driver's license and drives a car twice a week, but she has difficulty concentrating when she drives. (Tr. 607). She does not cook. (Tr. 626). She tries to wash dishes but ends up "doubled over the sink." *Id*. She occasionally goes to the grocery store. *Id*. She cannot sweep or mop due to back pain. She relies upon her granddaughter to do the laundry. (Tr. 627). She attends church services 2 times per month and visits with her daughter. (Tr. 628). She testified that she does not visit with others because she does not like people. (Tr. 628-29). She doe s not go to the movies; she has no hobbies; and she does not participate in sports, exercise, or do yard/garden work. (Tr. 629-30).

Plaintiff acknowledged that she has custody of four of her grandchildren. (Tr. 605). Plaintiff's daughter – who is the children's aunt – lives in the home and helps care for the children. (Tr. 606, 627-28, 633).

Plaintiff has a history of drug and alcohol abuse. (Tr. 630-31). Her appetite is diminished. (Tr. 631). On a typical day she gets up at 6:00 a.m. and gives medicine to her 13-year-old grandson, who has cerebral palsy. (Tr. 652). Her other grandson helps him get into his wheelchair and helps him get on the bus. (Tr. 632, 636). Plaintiff has some crying spells during the day, and she may watch the news on television, otherwise she spends her days isolated in her room. (Tr. 633).

### B.    Medical Evidence and Opinions

### 1.
### Treating physicians

**Ugochukwu Nwokoro, M.D.**  Plaintiff treated with internal medicine specialist, Dr. Nwokoro, from November 2001 through at least October 2003.  (Tr. 271-333, 530-33).  Due to complaints of low back and neck pain, she received physical therapy and medications, including narcotic pain medications, analgesics, anti-inflammatories, and muscle relaxers.

Objective evidence includes an MRI of the lumbar spine taken January 29, 2002, which showed moderately advanced discogenic changes at the L4-5 level.  (Tr. 501).  An MRI of her cervical spine showed moderate degenerative disc and spondylotic changes, greatest at C5-6 and C6-7.  (Tr. 499-500).  The record also contains an incomplete copy of a MRI report of the lumbar spine taken on September 16, 2003. (Tr. 240-41).  The report shows some minor disc protrusions.  *Id.*

During the course of Plaintiff's treatment, Dr. Nwokoro completed three Basic Medical forms.  On February 21, 2002, Dr. Nwokoro opined that Plaintiff could not stand/walk for more than 1 hour in an 8-hour workday and for no more than 30 minutes at a time.  According to Dr. Nwokoro, Plaintiff could sit for no more than 1½ hours and for only 45 minutes at a time.  Dr. Nwokoro thought that Plaintiff could lift 11 to 20 pounds occasionally and 6 to 10 pounds frequently.  (Tr. 514-15).

On September 13, 2002, Dr. Nwokoro opined that Plaintiff was limited to standing/walking 40 minutes in an 8-hour workday and for only 20 minutes at a time.  Dr. Nwokoro indicated that Plaintiff could sit for 40 to 60 minutes during the workday and for only 30 minutes at a time.  According to Dr. Nwokoro, Plaintiff could lift up to 5 pounds frequently and 10 pounds occasionally.  Dr. Nwokoro further opined that Plaintiff was extremely limited in her ability to bend.  (Tr. 306-07).

On May 16, 2003, Dr. Nwokoro opined that Plaintiff could stand/walk 2 hours in

an 8-hour workday but only 20 minutes at a time.  Plaintiff could sit for up to 3 hours a day but for only 45 minutes at a time.  Dr. Nwokoro further opined that Plaintiff could lift 11 to 20 pounds occasionally and 6 to 10 pounds frequently.  (Tr. 304-05).

**Barbara Bennett, D.O.**  Plaintiff saw primary care physician Dr. Bennett from March to October 2001.  (Tr. 447-50).  After Dr. Nwokoro returned to Africa, Plaintiff re-returned to treatment with Dr. Bennett and continued to treat with her through at least February 2006 for chronic low back pain, bronchitis, and problems with her knees. (Tr. 426-44).

A CT of Plaintiff's cervical spine on March 30, 2004 showed "moderately advanced" degenerative disc and spondylotic changes greatest at C5-6 and C6-7.  (Tr. 343-44).

On December 19, 2005, Dr. Bennett opined that Plaintiff's lifting was limited to 5 pounds.  Dr. Bennett did not think that Plaintiff could stand or walk for more than 1 hour in an 8-hour workday; she could not sit more than 1 hour; and she could never climb, balance, stoop, crouch, kneel, or crawl.  Dr. Bennett found Plaintiff to have limited abilities to reach, handle, finger, feel, and push/pull.  Dr. Bennett further believed that Plaintiff's asthma would limit her environmentally in the workplace.  Dr. Bennett opined that Plaintiff was unable to perform sedentary or light work.  (Tr. 411-15).

Dr. Bennett also submitted interrogatory answers indicating her opinion that the Plaintiff would be unable to perform most basic work-related mental functions.  (Tr. 416-25).

**Advanced Therapeutic Services, Inc.**  Plaintiff treated at Advanced Therapeutic Services, Inc. between August 2003 and November 2005.  (Tr. 345-57, 384-95).  She was diagnosed with bi-polar disorder by a psychiatrist, Dr. Singh.  She saw Dr. Singh for adjustments in her medications with included Depakote, Lexapro, Seroquel, and Remeron and problems handling stress.

On August 30, 2005, Dr. Singh opined that Plaintiff's bipolar disorder left her with

poor coping mechanisms for handling stress and responding to stressors. Dr. Singh reported that Plaintiff suffered from severe mood swings, poor concentration, insomnia, poor coping mechanisms for stress, frustration, anxiety, rumination, and episodes of anger. Dr. Singh also reported that Plaintiff had poor organization of thoughts due to episodes of racing thoughts and variable mood. Dr. Singh noted that Plaintiff's mood lability affected her short-term memory. According to Dr. Singh, Plaintiff had poor or no ability to: relate to coworkers; deal with the public; interact with supervisors; deal with work stresses; function independently; maintain attention/concentration; understand, remember, or carry out simple job instructions; relate predictably in social situations; or behave in an emotionally stable manner. Dr. Singh also noted that Plaintiff had a fair ability to follow work rules, use judgment, maintain personal appearance or demonstrate reliability. (Tr. 372-83).

## 2.
## State Agency Physicians

**Damian M. Danopulos, M.D.** In August 2003 Plaintiff was evaluated by Dr. Danopulos at the request of the Ohio Bureau of Disability Determination (Ohio BDD). Plaintiff's complaints included effort-related shortness of breath, low back pain, and anxiety with depression.

Examination revealed normal breath sounds but expiration was prolonged. The lumbar and cervical spine was painful to pressure. She had normal, but painful, range of motion in her cervical spine. Her range of motion of the lumbar spine was normal and painless. A pulmonary function study showed a mild degree of obstructive lung disease.

Dr. Danopulos opined that Plaintiff's somatic impairments would not affect her ability to work. (Tr. 224-39).

**Paul H. Dillahunt, M.D. and Maria P. Congbalay, M.D.** Dr. Dillahunt, reviewed the record for the Ohio BDD in October 2003. According to Dr. Dillahunt, Plaintiff could perform medium work exertionally. He noted she should avoid

6

concentrated exposure to heat, cold, wetness, humidity, and fumes. (Tr. 263-67).

In January 2004 Dr. Congbalay reviewed the record and stamped her agreement with Dr. Dillahunt's opinions without any supporting explanation. (Tr. 267).

**Aivars Vitols, D.O.**  Plaintiff was consultatively examined by Dr. Vitols in January 2006.  His examination showed a slightly altered gait that favored the left lower extremity.  There was minimal myospasm in the cervical spine and range of motion was slightly reduced.  Tinel's sign was negative at the carpal tunnel.  The dorsolumbar spine showed some slight myospasm and tenderness to palpation.  Range of motion in the lumbar spine was limited.  The left knee showed significant medial joint line pain with a positive McMurray's test and a hint of joint effusion.  The right knee showed only global tenderness.  Dr. Vitols diagnosed degenerative joint disease, spondylosis cervical spine, chronic low back pain, torn medial meniscus of the left knee, and chronic bronchitis.  Dr. Vitols concluded that Plaintiff could lift/carry 30 pounds occasionally and 10 pounds frequently.  (Tr. 406).  Dr. Vitols did not think that Plaintiff could stand or walk for more than 4 hours total a day and for only 30 minutes without interruption.  Dr. Vitols did not think that Plaintiff should ever climb or balance and could occasionally, stoop, crouch, kneel, or crawl.  (Tr. 396-409).

**Jerry E. Flexman, Ph.D.**  Dr. Flexman evaluated Plaintiff in June 2002 for the Ohio BDD.  On mental status examination, Plaintiff's posture was slumped while sitting and tense and there was a notable gait disturbance.  Facial expressions revealed sadness and general body movements were restless and fidgety.  Eye contact was fair with overt pain behavior noted while sitting, standing, and walking.  Affect was dramatic and expansive with lability present.  Plaintiff was angry and cried.  Dr. Flexman noted that Plaintiff did not have the insight to acknowledge the presence of psychological issues in her life or its affect on her ability to function.  Somatization was present.  Dr. Flexman diagnosed a pain disorder, major depression, and a personality disorder, and he assessed

Plaintiff's Global Assessment of Functioning (GAF)[3] at 60, referring to "moderate symptoms ... or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision at p. 34. Dr. Flexman opined that Plaintiff had moderate difficulties in her ability to sustain attention and concentration and marked difficulties interacting appropriately with the public, supervisors and co-workers and responding appropriately to work pressures. (Tr. 534-39).

Dr. Flexman also evaluated Plaintiff in September 2003. He noted Plaintiff's posture was relaxed and there was no gait disturbance. Plaintiff was compliant during the evaluation and maintained a fair level of eye contact. Affect was dramatic and expansive with lability present. Plaintiff cried during the evaluation. Plaintiff performed household chores such as preparing food throughout the day, doing dishes, dusting, cleaning, and general straightening up around her home. She also cared for her grandchildren, visited with her children, watched television, read, talk on the phone, she reported going to bars at least once per week and handling her own finances. (Tr. 243). Dr. Flexman judged her level of intellectual functioning as "average." Her memory was intact, and her judgment was noted to be "fair." Dr. Flexman felt Plaintiff lacked insight to the role her psychological issues played in her life. Dr. Flexman again reported that somatization was present. Dr. Flexman diagnosed major depression, a somatoform disorder and a personality disorder polysubstance abuse in remission and assigned a GAF of 45, "serious symptoms ... or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)...." DSM-IV-TR at 34. Dr. Flexman opined that Plaintiff had moderate limitations on her ability to sustain concentration. Dr. Flexman noted Plaintiff's ability to interact with others – including the public, supervisors, and co-

---

[3] Health care professionals use the GAF scale to assess a person's psychological, social, and occupational functioning on a hypothetical continuum of mental illness. It is, in general, a snapshot of a person's "overall psychological functioning" at or near the time of the evaluation. *See Martin v. Commissioner*, 61 Fed.Appx. 191, 194 n.2 (6th Cir. 2003); *see also* DSM-IV-TR at 32-34.

workers – was markedly impaired, as was her ability to handle the stress and pressure of work.  (Tr. 242-45).

**Deryck D. Richardson, Ph.D. and Joan P. Williams, Ph.D.**  Psychologist Dr. Richardson reviewed the file on behalf of the Ohio BDD in October 2003.  (Tr. 246-62). He opined that Plaintiff was markedly limited in her ability to understand and remember detailed instructions.  (Tr. 247).  She was not significantly limited in many mental work abilities such as the ability to maintain attention and concentration for extended periods, the ability to sustain an ordinary routine without supervision, and the ability to work in coordination with others without distraction.  (Tr. 247).  Dr. Richardson concluded, "A substantial loss of functional ability was not documented."  (Tr. 249).  Another record-reviewing psychologist, Dr. Williams, stamped her agreement with Dr. Richardson's opinions in January 2004 without providing any supporting explanation.  (Tr. 249).

## III.    ADMINISTRATIVE REVIEW

### A.    "Disability" Defined and the Sequential Evaluation

The Social Security Act provides for the payment of Widow's Insurance Benefits (WIB) to a disabled widow whose husband has died while fully insured.  42 U.S.C. §402(e).  To qualify for WIB based on a disability, the widow must be unmarried, between the ages of fifty and sixty, be the spouse of a wage earner who dies fully insured, file an application for such benefits, and be under a "disability" as defined in the Social Security Act.  *See* 42 U.S.C. §402(e)(1); *see also* 20 C.F.R. §404.335.

The definition of the term "disability" in WIB cases is the same definition of "disability" applied in other cases under Title II of the Social Security Act, such as cases involving claims to Disability Insurance Benefits.  To prove such a "disability" the claimant must show that he or she suffers from a medically determinable physical or mental impairment that can be expected to result in death or has lasted, or can be expected to last, for a continuous period of not less than twelve months.  42 U.S.C. §423(d)(1)(A). This impairment must render the claimant unable to engage in his or her previous work or

in any other substantial gainful employment existing in the national economy. 42 U.S.C. §423(d)(2).

The Social Security Administration provides SSI to indigent individuals, subject to several eligibility requirements. Chief among these, for purposes of this case, is the "disability" requirement. To receive SSI, an applicant must be a "disabled individual." 42 U.S.C. §1381a; *see Bowen v. City of New York*, 476 U.S. 467, 470 (1986). The phrase "disabled individual" – as defined by the Social Security Act – has specialized meaning of limited scope. It encompasses only those who suffer from a medically determinable physical or mental impairment severe enough to prevent them from engaging in substantial gainful activity. 42 U.S.C. §1382c(a)(3)(A); *see Bowen*, 476 U.S. at 469-70. An SSI applicant bears the ultimate burden of establishing that he or she is under a disability. *Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 683 (6th Cir. 1992).

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence. *See* Tr. 23-24; *see also* 20 C.F.R. §416.920(a)(4). Although a dispositive finding at any Step terminates the ALJ's review, *see also Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the evaluation answers five questions:

1.     Is the claimant engaged in substantial gainful activity?

2.     Does the claimant suffer from one or more severe impairments?

3.     Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4.     Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5.     Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §416.920(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

### B.    The ALJ's Decision

The ALJ found at Step 1 that Plaintiff had not engaged in substantial gainful activity since her claimed disability onset date of December 31, 1990.  (Tr. 36).

The ALJ found at Step 2 that Plaintiff has the severe impairments of "chronic neck and back pain due to degenerative disc disease, chronic left knee pain due to a complex tear of the medial meniscus, possible bilateral carpal tunnel syndrome, bronchitis, and bipolar disorder."  (Tr. 36).

The ALJ determined at Step 3 that Plaintiff never had an impairment or combination of impairments that meet or equal the level of severity described in Appendix 1, Subpart P, Regulations No. 4.  (Tr. 36).

At Step 4 the ALJ concluded that the Plaintiff has retained the residual functional capacity to perform light work[4] at all times since her alleged disability onset date. However, she was restricted to standing or walking for a total of just 4 hours per day and was limited to lifting 30 pounds occasionally and 10 pounds frequently.  Plaintiff was also limited to only occasional stooping, kneeling, crouching, and crawling, and she was precluded from balancing or climbing ladders, ropes, or scaffolds or from working around hazards or pulmonary irritants.  (Tr. 36).  As to her mental restrictions, the ALJ found that Plaintiff "is also restricted to performing simple one- or two-step tasks, which require little, if any, concentration, no complex or detailed instructions, and no direct interpersonal contact with members of the general public."  (Tr. 36).

The ALJ further found at Step 4 that Plaintiff had no past relevant work.  (Tr. 37).

The ALJ's assessment of Plaintiff's residual functional capacity, along with his

---

[4]The Regulations define light work as involving the ability to lift " no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds...." 20 C.F.R. §416.967(b).

findings throughout the sequential evaluation, led him to conclude that Plaintiff was not under a disability before April 3, 2006. (Tr.37-38). The ALJ further determined that the so-called Grids, specifically the Commissioner's Medical-Vocational Guidelines, 20 C.F.R. Subpart P, Appendix 2, 202.04, directed a "disability" finding beginning on April 3, 2006 and continuing thereafter. (Tr. 37-38).

## IV.    JUDICIAL REVIEW

Judicial review of an ALJ's decision proceeds along two lines: whether substantial evidence in the administrative record supports the ALJ's factual findings and whether the ALJ "applied the correct legal criteria." *Bowen v. Comm'r. of Social Security*, 478 F3d 742, 745-46 (6th Cir. 2007).

"Substantial evidence is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Bowen*, 478 F3d at 746 (citing in part *Richardson v. Perales*, 402 U.S. 389, 401 (1977)). It consists of "'more than a scintilla of evidence but less than a preponderance...'" *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Judicial review of the administrative record and the ALJ's decision is not *de novo*. *See Cutlip v. Secretary of Health and Human Servs.*, 25 F3d 284, 286 (6th Cir. 1994). And the required analysis is not driven by whether the Court agrees or disagrees with an ALJ's factual findings or by whether the administrative record contains evidence contrary to those findings. *Rogers*, 486 F.3d at 241; *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld "as long as they are supported by substantial evidence." *Rogers*, 486 F.3d at 241 (citing *Her*, 203 F.3d at 389-90).

The second line of judicial inquiry – reviewing the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *See Bowen*, 478 F3d at 746. This occurs, for example, when the ALJ has failed to follow the Commissioner's "own regulations and where that error prejudices

a claimant on the merits or deprives the claimant of a substantial right." *Bowen*, 478 F.3d at 746 (citing in part *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 546-47 (6th Cir.2004)).

## V.    DISCUSSION

### A.    Plaintiff's Contentions

Plaintiff contends that she is more limited mentally than the ALJ found.  She argues that the ALJ erred in rejecting the opinion of treating psychiatrist Dr. Singh because Dr. Singh's opinions were (1) consistent with her treatment notes, (2) consistent with her limited daily activities, which the ALJ mischaracterized, and (3) in part consistent with Dr. Flexman's opinion.  Plaintiff further maintains that the ALJ erred by not evaluating the opinions of the state agency psychologists, who believed that Plaintiff was limited to simple, routine, repetitive tasks that did not require a rapid pace.

Plaintiff also contends that the ALJ erred by rejecting the February and September 2002 opinions of his treating physician Dr. Nwokoro and erred by finding Dr. Vitols' opinions to be consistent with Dr. Nwokoro's opinions.  Plaintiff explains, "unlike Dr. Vitols, Dr. Nwokoro did not think [Plaintiff] could sustain even a limited of light work for more than five hours a day."  (Doc. #9 at 18).  Plaintiff further contends that the ALJ failed to appreciate that treating physician Dr. Bennett's opinion was consistent with Dr. Nwokoro's opinions and failed to properly evaluated Dr. Bennett's opinion, which was based in part on objective medical test results.

### B.    Medical Source Opinions

The treating physician rule, when applicable, requires the ALJ to place controlling weight on a treating physician's or treating psychologist's opinion rather than favoring the opinion of a nonexamining medical advisor or a one-time examining physician or psychologist or a medical advisor who testified before the ALJ. *Blakley v. Comm'r. of Social Security,* 581 F.3d 399, 406 (6th Cir. 2009); *see Wilson v. Comm'r. of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004).  A treating physician's opinion is given

controlling weight only if it is both well supported by medically acceptable data and if it is not inconsistent with other substantial evidence of record. *Blakley,* 581 F.3d at 406 (6th Cir. 2009); *see Wilson*, 378 F.3d at 544.

"If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of the examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley,* 581 F.3d at 406 (citing *Wilson*, 378 F.3d at 544).

More weight is generally given to the opinions of examining medical sources than is given to the opinions of non-examining medical sources. *See* 20 C.F.R. §416.927(d)(1). Yet the opinions of non-examining state agency medical consultants have some value and can, under some circumstances, be given significant weight. This occurs because the Commissioner views such medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." Social Security Ruling 96-6p. Consequently, opinions of one-time examining physicians and record-reviewing physicians are weighed under the same factors as treating physicians including supportability, consistency, and specialization. *See* 20 C.F.R. 20 C.F.R. §416.972(d), (f); *see also* Ruling 96-6p at *2-*3.

###     C.     Analysis

Beginning with the ALJ's assessment of Plaintiff's mental work abilities, he concluded, in part, that she was limited to simple "is also restricted to performing simple one- or two-step tasks, which require little, if any, concentration, no complex or detailed instructions, and no direct interpersonal contact with members of the general public." (Tr. 36). The ALJ explained that these restrictions "adequately accommodate the mild to moderate level bipolar symptoms [Plaintiff] periodically experiences. These restrictions adequately accommodate Dr. Flexman's concern over [Plaintiff's] ability to relate to

14

others and cope with work stress as well as the simple, repetitive task restriction suggested by the BDD reviewing psychologists." (Tr. 32).

Dr. Flexman examined Plaintiff twice for the Ohio BDD. (Tr. 242-245, 534-539). The second examination occurred in September 2003, when Dr. Flexman diagnosed Plaintiff with major depression, somatoform disorder, and a personality disorder. (Tr. 27, 242-245). The ALJ correctly noted that Dr. Flexman found Plaintiff markedly limited in her ability to interact with others and to cope with stress. (Tr. 31, 242-245). The ALJ also appropriately considered the opinions of Ohio BDD psychologists Drs. Richardson and Williams, who reviewed all the record evidence and concluded that Plaintiff was only moderately limited in social functioning, her activities of daily living, and in concentration, persistence or pace. (Tr. 31, 246-262). The ALJ accepted these psychologists' opinion that Plaintiff had the ability to understand, remember, and carry out instructions for routine, repetitive tasks. *Id.* In finding that Plaintiff was moderately limited in social functioning and in concentration, persistence, or pace, the ALJ explained that he accommodated the psychologists' conclusions by limiting Plaintiff to simple one- or two-step tasks which required little, if any, concentration, no complex or detailed instructions and no direct interpersonal contact with members of the general public. (Tr. 28, 31). The ALJ further articulated the basis of his mental residual functional capacity evaluation by noting that his restrictions accommodated Dr. Flexman's concern regarding Plaintiff's ability to relate to others and cope with work stress as well as the state agency reviewing psychologists' restriction for simple, repetitive tasks. (Tr. 32). And, in finding Plaintiff not as mentally limited as she alleged, the ALJ noted his consideration of her medication regimen, which she tolerated and found effective in regulating her mood and helping her sleep. (Tr. 31).

Contrary to Plaintiff's contentions, the ALJ reasonably evaluated, and disagreed with, the opinions of Dr. Singh. As the ALJ explained, Dr. Singh's interrogatory responses, which described extreme limitations, were inconsistent with progress notes

showing mostly normal findings and no evidence of any severe psychological symptoms. (Tr. 32, 372-383). Further, the ALJ recognized that Dr. Singh's opinion about Plaintiff's level of mental restrictions was inconsistent with her daily activity level, which included caring for several grandchildren and a young great-grandchild. (Tr. 32). The ALJ did not err by considering the fact that Plaintiff had custody of four of her grandchildren as part of his assessment of her mental functioning.

Turning to Plaintiff's residual functional capacity for physical work activities, she has not established that the ALJ erred in evaluating the medical source opinions or that substantial evidence does not support the ALJ's findings. The ALJ properly considered not only her activities of daily living, but also the medical source opinions of the consultative examiner, her treating physician, and the state agency reviewing physicians. In accommodating Plaintiff's meniscal tear in her left knee, the ALJ restricted her balancing or climbing ladders, ropes or scaffolds, restricted her to standing and walking for a total of just four hours per day and from work around hazards. (Tr. 29). The ALJ reasonably considered that, despite her complaints of debilitating pain, Plaintiff had not needed an ambulatory aid. (Tr. 29). Plaintiff's ability to care for several children, including young children, during the relevant period prior to April 2006, belies her allegation of debilitation pain. In finding Plaintiff was not as limited as she alleged during her testimony, the ALJ noted that her activities also included driving, household chores (washing dishes, making beds, grocery shopping), preparing food, and going to the bars weekly. (Tr. 30). The ALJ thus explained that Plaintiff's activities and day-to-day functioning were consistent with an ability to perform light work. (Tr. 30).

The ALJ relied upon Dr. Vitols, the consultative examiner, in reaching his physical residual functional capacity finding for a range of light work. (Tr. 28, 396-409). The ALJ considered that Dr. Vitols' assessment was consistent with the opinions of the state agency reviewing physicians, Drs. Dillahunt and Congbalay, who found Plaintiff was more capable and could perform medium work. (Tr. 29, 263-267). The ALJ also relied

16

upon the objective treatment records to find Plaintiff more capable than Dr. Nwokoro believed. (Tr. 29). Contrary to Plaintiff's argument, the ALJ articulated his consideration of Dr. Nwokoro's opinion that Plaintiff could perform light level work. (Tr. 29, 307). And the ALJ did not fully reject Dr. Nwokoro's opinion. Instead, the ALJ's residual functional capacity finding was based more on Dr. Vitols' assessment while not being at odds with Dr. Nwokoro's assessment. (Tr. 29). The ALJ noted his residual functional capacity finding was also consistent with Plaintiff's conservative treatment history and the lack of more aggressive treatment of her allegedly debilitating pain. (Tr. 29).

The ALJ also adequately articulated his rejection of the opinion of treating physician Dr. Bennett, given her uncritical acceptance of Plaintiff's subjective complaints. (Tr. 30). Dr. Bennett submitted interrogatory answers suggesting that Plaintiff was extremely limited, but as the ALJ correctly observed, Dr. Bennett had provided Plaintiff with only periodic, conservative treatment. The ALJ also considered Dr. Bennett's opinion of mental restrictions, but he found they were similarly only entitled to minimal weight. (Tr. 31). And the ALJ did not err in relying on Dr. Vitols' opinions, because his opinions were consistent with the objective and clinical medical evidence of record and consistent with the opinions of the state agency physician.

Accordingly, Plaintiff's Statement of Errors lacks merit.

## IT IS THEREFORE RECOMMENDED THAT:

1. The Commissioner's non-disability determination be AFFIRMED; and

2. The case be terminated on the docket of this Court.


January 26, 2010                                    s/ Sharon L. Ovington
                                                Sharon L. Ovington
                                            United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).